He demands that the US Institute of Foreign Policy of the United Nations, in author's It was irritating, I'm sorry. Why is this coming? I didn't remember if I light it, but I left it home. Got to be too heavy. Okay, the next case is number 16, 1630, AFCAR Incorporated against the United States. Mr. Phillips. Good morning, your honors. If it please the court, we're here on a procurement case today. And I'd like to start by reviewing the nature of that procurement. The court of federal claims quoted multiple documents that were protected under a protective order. But when it issued its opinion under seal, neither party requested redactions. Do you object to our discussion and oral argument of that information? Absolutely not, your honor. Okay, thanks. Okay. And with respect to the procurement, what we're dealing with is a standing solicitation under the Federal Supply Schedule Program to supply pharmaceutical products, both brand name and generic drugs. The procurement results in an award where drugs, packaged drugs, are available. But these aren't new task orders under a general supply contract. This involves an RFM, correct? No, we have an offer for a new five-year contract, your honor, which we submitted in October of 2014 that is still sitting in front of the VA and has not been acted on. The standing solicitation gives you a five-year term and then says at the expiration you may submit a new five-year contract. In the contract you offer a range of products. We had the contract in 2010. We applied for a new contract in 2014. Some of the same products, some different products. That offer is the procurement that's still sitting there. Do you dispute any of the CFC's factual findings? The only factual finding I dispute is a inferred finding where the COFC, the trial court, presumes that my client was aware that there was an alternative to supply supplier CSPs. The record documents that GSA, this program is managed by GSA. VA runs it under a delegation of authority from GSA. And there was a dialogue where GSA expressly told VA, you can determine price reasonableness without getting CSPs. And the relevant document, which is at the appendix 603, the government said, not to be shared outside the government, but GSA has told us this. If you look at the decision, the decision seems to suggest that Avcare is being difficult because we haven't pursued that option. The problem is we weren't told of that option. So it's sort of a mixed law in effect? Yes, sir. And if you look at the record, there's an audit report by the OIG. They perform routine pre-award audits. And they said to the contracting officer, and it's the appendix 565, we recommend you get supplier CSPs. The CO then, and this is the document that resulted in the litigation, said we're requiring that you give us manufacturer CSPs. So there's the confusion. The government knows internally we don't have to supply these CSPs. There's an alternative. They've never communicated that to my client. Okay, but backing up to my question, only because it pertains to jurisdiction. Yes, ma'am. The CFC decided it had no jurisdiction over objections you raised to what are called RFMs. Correct. It then decided the merits on the bid protest. Is that accurate? It decided the merits on our offer to renew the contract. Right, right. Okay. But to the extent that you are appealing, are you appealing? I thought you were. The CFC's determination that it lacked jurisdiction over the RFM objections. Yes. So let's go back to my question then. To the extent that you're appealing claims related to the CFC's determination it didn't have jurisdiction, why would requests to modify an existing contract be a new procurement under the federal law or regulation? Because they're not requests to modify an existing contract. Well, what are RFMs? What does it stand for? Well, it's just the title the VA used. Well, what does it stand for? It says request for modification. Right, okay. I understand. But the procurement is to offer a range of drugs which go into a catalog. Those drugs can then be supplemented during the life of the contract. I understand, but it's during the life of the contract. It is supplementing the contract by adding new drugs. We agree it's supplementing the contract. We're not changing the term of the contract. We're just exercising our right under the federal supply program. But you've got law out there, right? We've got all this procurement law on this jurisdiction space. And I know because I've been involved, and so has Judge Wallach, in a number of these cases recently, including the Coastal Products case, where we decided that task orders are, in fact, new contracts and, therefore, are bid protestable because they fall under the procurement law. But what we also said expressly in Coastal is modifications to existing contracts have long been held by our law not to be new procurements and, therefore, don't fall under bid protest law. So you've got to convince me that somehow your RFM, despite its title, is not a request for modification which we have traditionally held does not fall under the jurisdiction of the Court of Federal Claims for bid protest. You can still do a CDA. There's still another vehicle for you to appeal that. It's just not this vehicle. So tell me from a factual matter why should I somehow depart from our precedent which says modifications to existing contracts don't fall under this vehicle for appeal and I should find this is more like a new task order or something along those lines? Try and make an argument to explain to me why that does. It's not a new task order, Your Honor. It's a procurement of drugs. The FSS program, what does the vendor do? They submit an offer and they say in the offer, we're producing the drugs at these facilities that comply with FDA good manufacturing practices and the price are fair and reasonable. The VA reviews that. If they agree it, they award the contract. All those items get uploaded into a catalog which then orders can be placed against. Let me ask you a couple of factual questions. Sure. In the blue brief at 39, you say Avcare, quote, takes the raw drugs and processes them into package sellable doses. What process is that describing? Well, it's describing the repackaging process. And I've actually blocked it. So you're dividing the pharmaceutical products that you receive? Avcare is repackaging. Unless you're going to show us something that's in the record. Pharmaceuticals. They get drums. This is idemperfect. Is this in the record? The process is, yes. Then put it away. If this exhibit is not in the record, it's totally inappropriate for you to bring it to court. I'm just trying to read your equipment, Your Honor. Okay. So what they do is they get a bulk of pharmaceuticals. They then decide how are we going to do market research? How are we going to offer this to the customer? But the bulk pharmaceuticals are pills. They're not drugs that you form into pills. No, we don't. We don't press the pills. That's undisputed. So when you divide the pharmaceutical products, you're simply taking a great big drum of them and putting them into smaller containers. Well, it's a mass production facility, Your Honor. It goes through a processing line where you have a big vat. The mass quantities of pills are put in the vat. It goes through. They're packaged in whatever the quantity is, 30 count, 50, 500. Okay, here's another fact question. There was a finding made by the Court of Federal Claims that AFCAIR made no attempt before the VA to substantiate that its supplier's CSP information cannot be obtained. Did AFCAIR request the CSP information from its suppliers? And if so, where's that in the record? It's not in the record because we were not aware that that was an option. The government never said, hey, if you show us the suppliers won't give us your CSPs, we'll waive the requirement. They didn't tell that to us. That's the inherent conflict in this procurement. So when the Court of Federal Claims says in its dismissal of the original bid protest, AFCAIR indicated it would submit requests to its suppliers to ascertain their willingness to supply their CSP information, which is 125 fed claims at 21. That wasn't correct? Well, it wasn't correct, Your Honor. I'll quote it again. AFCAIR indicated it would submit requests to its suppliers to ascertain their willingness to supply their CSP information. During oral argument, I was asked that question. I said, if we're given that option, we'll do it. Yes. Okay, that's how it comes out. That's how it came out. Okay. So that's the conflict in the procurement. And the hallmark of procurement law is the government needs to tell us. Let me just follow up on that. Did you ask them? And then you say you did ask them. What do you mean, have I asked? It's not in the record. Do you want me to ask what we've done off the record? No, I don't. So there's nothing in the record that shows that that was right. Because we were never given the opportunity during the procurement and told, hey, if you go ask them and they say no, we won't press ahead with this requirement. When the Court said that and you said, well, we'll ask, you didn't submit anything afterwards to show that you did ask. At that point, the record was closed, Your Honor. But the record does not show that the government insists that it was clear in terms of what it was that they were asking for and that they didn't receive. But they don't say that they offered to waive the requirement if certain threshold information was provided. Your view is that had they said they would have waived the requirement, that that would have satisfied the review? Yes. My client just wants a new contract. We're not trying to win a debate about CSP requirements. If they had said, you ask your suppliers if they'll provide CSPs, and if the answer is no, we'll do something else, absolutely. We would have pursued that option. But literally during the course of the procurement, the underlying procurement, remember, we submit the offer in October 2014. It's reviewed by the VA. There are exchanges. We updated in June of 2015. And they then give us a take it or leave it. You have to submit supplier CSPs. At that point, we go to the Court. We have no further dialogue with the government. In the blue brief, one of the points you raise is that there was an anonymous letter to the Office of the Inspector General and then internal audit reports, and that you've never seen them. Well, correct. I've seen them. My client was never given the opportunity to address them or rebut them. Okay, so you do have them. Only as part of the record in this case. It was filed under seal in the record of this case. Again, my client has not been subject to a due process proceeding where it was allowed to address those allegations. Okay, let's hear from the government because there are things we need to clear up. Yeah, there are a lot of things we need to clear up. Mr. Poirier. That is correct. There are marked inconsistencies between what the appellant says was offered and was the position, and as it's represented in your brief. Can you clarify? They said they were never told that if the basic supplier didn't want to tell what its profit was or whatever it was that might have followed from the requested information, that that would have met the government's requirement for information. Right. I don't believe it does meet the government's requirements for information. I think counsel is mistaken. In other words, the solicitation requires a company like GAVCARE to provide certain information, including the manufacturer price information. But what information? I mean, here we're told that had the information which was available been requested, or from your brief I have the impression that what was being requested was some of the threshold manufacturers' profit and loss statements, raw material costs, and so on, which is not generally made available to the public. The standard provision, which is at page 132, Your Honor, is from a GSA regulation, and it's a required mandatory provision in the VA solicitation. And at section 5 on page 132, it lists six different items that are required to be provided. And I guess the one that's most contentious is the manufacturer's list price and the dealer's reseller's percentage discount from list price or net prices. So that is pricing information that's required. The page from the record that counsel cited when he stood up is page 603, and it says to the VA, look, if they try as hard as they can to get this information and they really convince you that it was just impossible and you verify that it was simply impossible, you have authority to waive this requirement. That had not been the VA's understanding prior to that e-mail, if that's fair to say. The VA, and this is in April of 2015 they got that e-mail. It had not been the VA's understanding. However, the VA did say when the first protest was dismissed, look, go out and try and get this information at a minimum and come back to us, we'll talk. If there was nothing to talk about, if it were incomprehensible that there would ever be a waiver, there's no need to even tell the person to go out there and see what you can find and bring the information. The way that counsel has described the waiver authority that GSA told VA they have, it's an option. You don't really have to go get the information. You can just get a note from the manufacturer saying, no, we don't want to, and that's good enough. Well, that's not what the regulation provides, and that's not a reasonable understanding of when you might be able to get a waiver. The information we're talking about is product by product, and there are hundreds of different products on the schedule. Well, you've made sort of two different arguments here, and let me see if I understand both of them. Are you saying, number one, the regulation requires the information to be produced, and while we may have been informed that we have waiver authority, we don't have to tell all of the contractors that? Is that your position? Is one of your positions that you are not obligated to provide that information to contractors? It's not in the regulations. It's something by email someone told you that you could do. Right. That's an interesting question. I don't know whether, first of all, it's interesting as to whether or not somebody at the GSA can send a note by email and grant the VA waiver authority. Are you also arguing then that you're not even certain that such waiver authority is legally authorized in light of the regulation? Yeah, it's hard to say. I haven't really researched whether waiver authority is always inherent. The problem with waiver authority is, in the context of a solicitation, is that you have to treat all the offerors equally. And so if you are waiving certain solicitation provisions for one offeror and not waiving a solicitation provision for another offeror, even though it's an open solicitation, is that equal treatment? But there's three possible arguments, and I kind of feel like you're sort of but not really making all three of them. So I'm trying to figure out what your argument is. Wait. Argument number one is we may not actually legally have waiver authority. Argument number two is even if we have waiver authority, we don't have to tell everybody that that's not part of what's required because it's not expressed in the regulation. And then argument number three is you said, well, we did tell them at least go out and try. That implies that there is some authority to do something if they try and are unable to get the information. And that sort of seems to be a fallback argument. If court, if you decide there's waiver authority and if you decide we had to inform them, then we sort of kind of did because we told them to go out and try and get the information, which implies that if they're unsuccessful, maybe there's something that could be done. So I'm trying to figure out precisely where your argument lies. And you can make arguments in the alternative. That's never a bad thing to do. But I just need to know precisely what the government's position actually is. Yeah. I think it's fair to say I said all three of those things, but none of those are really the issue. They didn't seek a waiver. What's in the administrative record, and it's very clear, is throughout the process, the dispute was the government saying we want you to get this information, the contracting officer, and AFCAIR saying, no, we won't do it. We refuse to do it. We're a manufacturer. We don't have to do it, and we're not going to do it. And there's a long history of correspondence back and forth between AFCAIR and the contracting officer. So that was the dispute, and that was the issue that was posed. Does the contracting officer have authority to enforce this information disclosure requirement? Mr. Poirier, am I pronouncing it right? Poirier, yes. I find this case confusing. Let me tell you why. You referenced the record, and yesterday you filed a motion to supplement, which I printed out and I reviewed. And still, at least one document, the OIG September 10, 2014 report, is listed in the joint appendices table of contents, and it's not in there. And it's not in the supplement. The joint appendix doesn't include multiple documents that were central to the Court of Federal Claims findings. And in the red brief, and this just, I want you to know, frosted me. At the bottom of 13 and continuing on to 14, you purport to quote from AFCAIR's initial offer. And you cite to JA 4515 to 32. Those are transcript pages, and they don't appear. None of those pages contain the quoted language. So I thought, geez, well, this supplement will fix that. It doesn't. You know, it's sort of hard to do this kind of work if the references, page references, are a mystery. Right. Absolutely. As far as the general part in terms of the supplemental, those pages, through confusion, our pages had the same page numbers as some of the pages that they had. I know what you did. I saw your motion. That's what happened. So you're right. The page you just cited from the AFCAIR's should appear at 14532, just adding a one. And if it doesn't, then that's my responsibility, and I apologize to the court. I don't know why, but anything, any page number higher than 4500 should have a one in front of it, and it should appear in that third volume. No, it just doesn't appear. Then that, all I can say is that's completely my responsibility, and I apologize. I don't think that particular fact is in dispute. No, it's not, because it appears elsewhere in a totally separate document. At JA155-58, but that's not my point. No, it's a mess, and I apologize. Okay, perhaps you can review the submission and see if anything else has been omitted. I will go citation by citation, Your Honor, as soon as I get back to my office. Okay. Now, I'm trying to figure out what's really going on here. As far as I can tell, all right, here we have the government, so the contracting officer asked for manufacturing information. So AFCAIR says, eventually, we don't make the drugs, but we do other things. And then it looks as if, but it's hard to tell because no one really says, that perhaps what the contracting officer does say is we want to make sure that there aren't undue profits. We want to know what you buy and what you sell and what's really happening. Is that, in fact, what was going on? That the question would have been resolved if AFCAIR had said, this is what we pay the producers of the drugs, and this is what it costs us to put it in the smaller bottles and to resell. And then the contracting officer looks at that and says, you're making too much money on this contract, and therefore, we're not going to renew it. There is this gap. It seems that, at least at the threshold, there was no uncertainty as to who was producing these complex molecules that are the drug molecules. There was the assertion, well, we're a manufacturer, which certainly seems to have put the government off. But in due time, particularly with the renewals, and then with the short-term renewals, and the apparent absence of, at that stage at least, a competitive bid that was at a stage that seemed to press for just granting something to a competitor. So what, in fact, was the government after? It must have been very clear at one stage that AFCAIR was not a manufacturer of the raw drug. Or even they didn't make the pills. They bought in bulk and they repackaged. They used the official label. They complied with everything that the VA needed to know for prescribing. I think, honestly, Your Honor, the biggest picture, if you really want to understand what the case is all about, Congress has been unhappy with the VA, doesn't think that they get good prices. Some point in time, somebody said you were supposed to be requiring certain information to do your price analysis and so forth. They went through and... The price analysis. But once it became clear that they were not the manufacturer for the raw materials, but were looking for a price analysis, I thought the regulation was not unreasonable in that it required a comparison with sales on the market, if there are sales on the market. What's happened is this particular provision that we've been talking about, the reseller requirement, is a narrow provision. It's a standard form provision. It's in the solicitation. It was notice and comment promulgated by the GSA many years ago. And it says that if you are a reseller without significant sales to the general public, that narrow class, that you have to provide this extra information, including the manufacturing price. That's a different kind of information. So what's at issue in this case is, can the VA require a reseller without significant sales to the general public to provide this additional information? Avcare argued throughout, you don't need it. You have other ways of doing your price comparison. You don't have to have it. We don't want to give it to you. Our manufacturers don't want to give it to you. You can't have it. And what the contracting officer said is, it's a requirement, and we want it, and we want you to get it. And Avcare said no. Now, as to the merits, the only one thing that I want to do. Well, your opposing counsel says you never asked for it. Well, that's in the administrative record, Your Honor. We asked for it many times. We said you're not a manufacturer. Therefore, you have to provide this information. There's one point that I just want to point out. The GSA does not anywhere in the preambles or antennas describe what they mean by manufacturer or reseller. Well, eventually, apparently, there seems to have been an understanding that the regulation was relating to actually producing from the raw materials in the chemical manufacturer. I think that's a good common sense understanding, but I don't think it's really spelled out anywhere in the ‑‑ it's just that's dictionary understanding, and it's fine. As opposed to being a manufacturer because you buy the already packaged pills, whatever you call them, and just put them in smaller bottles. Right. But that's not manufacturer. In this case, what's, I think, key is that if you read the solicitation as a whole, there are solicitation provisions that are cited in my brief at page 48 and page 53 of the Joint Appendix that say if you are a regulated dealer, you have to have a unique labeler requirement, an FDA requirement. And in that case, you have to have letters from the manufacturer. So, in other words ‑‑ Not to comply, the CO wasn't enforcing the FDA requirement. No, exactly. But the point is that the solicitation ‑‑ But isn't your point that since the solicitation says you have to have letters from the manufacturer, the manufacturer has got to be the producer of the drug? Right. The solicitation has these other provisions that make clear that a reseller, even a regulated reseller, like FDA ‑‑ Still not the manufacturer. Right. They're not an additional manufacturer. They're a reseller. Well, in that case, they should have prevailed by saying that we meet the requirements. They did have a labeler requirement. All I'm saying is the argument that they pressed before today in their briefs was that because they're a regulated entity, they should not be viewed as a reseller. They should be viewed as an additional manufacturer. That was their main argument before today. And all I'm saying is that there are provisions within the solicitation, page 48 and page 53, that make clear that even a regulated entity like FDA ‑‑ Is not a manufacturer. Is not. Even if they comply with all of the restrictions, it doesn't suddenly morph them into a manufacturer. Exactly. And I think that the GSA provision on its own, to be fair, is pretty vague. It's meant to apply to all kinds of different industries. But this solicitation has provisions that tailor your understanding, a fairly read, to show that they are not a manufacturer. Well, then, in that case, if everyone agrees they're not a manufacturer, then why should they have been objected to because they didn't provide the manufacturing information? No, I don't think they agree that they're not. They still claim that they are exempt from the reseller requirement because they claim to be a manufacturer. I think they're still making that argument. You can ask them. That's actually the primary argument on appeal, as far as I can tell. They're saying we qualify as a manufacturer and are therefore exempt from these requirements. Exactly. But in any case, as I understand it, if they're not a manufacturer and they're a reseller, you're entitled to look behind to see what the people who do manufacture the drugs they resell price it at. Right. If they're a reseller without significant sales to the general public, in that case, they think, well, there's enough information. That apparently was the GSA's policy position at the time. Okay. Any more questions for the Governor? Okay. Thank you. Thank you, Mr. Pryor. Mr. Phillips. Very briefly, Your Honor. I'm confused whether the government is saying there was an option beyond providing supplier CSP information. Clearly, as you read to me, the court said that they determined there was. There's been no showing that was shared with my client. The document that we've discussed, Appendix 603, says clearly not an option to be shared outside the government. It wasn't shared with Avcare. The GSAR, which governs the FSS program, makes it clear that CSP data is one means to do pricing analysis. There are other means. As you noted, compare prices of the same product. But you said there was nothing to compare with. Isn't that right? No, no. The products we are offering on the contract, there are other offerers providing the same products. So we maintain determining price reasonableness isn't a problem here. Ibuprofen, 400 milligrams, 30 count. You've got four offerers on the schedule. We're cheaper. Ergo, our price is reasonable. That's really the core position we offered. But whether we agree with you that that is an efficient and logical argument or not isn't at all the point, right? The point is, does the government have the authority to make this request of you? And were you correct to say you don't have to comply with it because you are a manufacturer and don't fall into the narrow category of resellers that are required to comply with this? Isn't that the question? The question isn't, do we think it makes sense for them to require this? The question is, your argument was we don't have to comply because we are a manufacturer and we have to evaluate that argument. So our argument is there is no one path to doing price analysis. CSPs are not a requirement. The GSAR 538-271 says otherwise. GSA confirmed it to VA. The VA acknowledged it. It's not the only way of doing it. That's the reality. Did you tell me in your primary argument that the government did not ask for CSP information prior to that court hearing? So we submitted a contract in 2010. That's a yes or no. I don't understand the question. I said to you that the Court of Federal Claims said Avcare made no attempt before the VA to substantiate its supplier's CSP. Information cannot be obtained. And you said it was never asked for prior to that. And you asked me, did we ever do it? And I said it's not in the record because we were never given the option to do it. Well, your opposing counsel says there are plenty of requests for your supplier's CSP information in the record, which is true. There are. There are. But there's no statement saying if you provide a statement that they declined to provide it, we will pursue another option. They never shared that with us. That's the problem. And again, what are the ground rules of the procurement? We want a contract. We don't want to debate, you know. But why do they have to share that with you? This is the part I don't understand. Why do they have to tell you there might be other options? Because it's not that there are automatically other options. The email from GSA or whoever the government service is that sent it to them said you could waive under certain circumstances, such as their manufacturer or suppliers are unwilling to provide the information. But you provided no evidence along those lines to suggest that you needed or were entitled to such a waiver. You responded not that we can't get the information or we need a waiver or we're unsure. You responded we don't have to give you this information, not in general, but because we are a manufacturer. Your Honor, all I can say is we were given a mandatory direction to provide this information. Yes, and what's wrong with that? Because it's not what the rules say. We didn't have the rules say it. No, no, the rule actually says that. You're saying the email that was supplied to the government, the VA, which indicated they had the ability to waive the rule says something different, right? Your Honor, the FSS program is managed by GSA. They control the policy, not the VA. And GSA has had a longstanding position. They don't even require CSPs on their schedules anymore, by the way. That's not relevant. I'm sorry. That's why we got into this trap, because CSPs are not a requirement either under the regs. The reason you got into the trap is because the only argument you made is we don't have to give it to you because we're a manufacturer, and that seems like an unwinnable argument now for you. That's why you're in the trap. All these other things you're saying are just statements in the ether that actually aren't relevant to the only issue decided and argued and appealed before us. The government gave us one option. We pushed back against that option. That's what we did. And you pushed back, saying we are a manufacturer. Yep, we did. Right. And we believe we are. That's all I have. Right. Thank you. Okay. Thank you. Thank you both. We'll work on this case and take it into submission.